## COMMONWEALTH *vs.* CYRUS ALGER.

By the colony ordinance of 1647, commonly known as the ordinance of 1641, the proprietors of upland bounding on the sea have an estate in fee in the adjoining flats above low water mark and within one hundred rods of the upland, with full power to erect wharves and other buildings thereon; subject, however, to the reasonable use of other individual proprietors and of the public for the purposes of navigation; and subject, also, to such restraints and limitations of the proprietors' use of them, as the legislature may see fit to impose for the preservation and protection of public and private rights.

The legislature of this commonwealth has power to establish lines in the harbor of Boston, beyond which no wharf shall be extended or maintained, and to declare any wharf, extended or maintained beyond such lines, a public nuisance; and statutes establishing such lines take away the right of the proprietors of flats in the harbor beyond the lines to build wharves thereon, even when they would be no actual injury to navigation; and such statutes, although they provide for no compensation to such proprietors, are not unconstitutional, as taking private property and appropriating it to public uses without compensation, within the meaning of the Declaration of Rights, art. 10; nor as impairing the obligation of the grant made by the colony ordinance, and thus transgressing the prohibition of the constitution of the United States, art. 1, § 10, against passing laws impairing the obligation of contracts. But such statutes do not affect the right to maintain wharves erected before their passage.

THIS was an indictment against the defendant for an alleged breach of the statutes of this commonwealth establishing the commissioners' lines, so called, in the harbor of Boston, by erecting, building, and maintaining a wharf over and beyond those lines into said harbor.

The indictment was found and returned into the municipal court of the city of Boston at June term, 1849. It set forth the following statutes for fixing and limiting the lines of the harbor of Boston: "An act to preserve the harbor of Boston, and to prevent encroachments therein," passed April 19, 1837, (*St.* 1837, *c.* 229, 7 Special Laws, 808); "An act concerning the harbor of Boston," passed March 17, 1840, (*St.* 1840, *c.* 35, 8 Special Laws, 157); "An act in addition to an act concerning the harbor of Boston," passed March 6, 1841, (*St.* 1841, *c.* 60, 8 Special Laws, 204); and "An act concerning lines in Boston harbor," passed April 26, 1847, (*St.* 1847, *c.* 278 8 Special Laws, 836); and also certain resolves passed

5*

May 10, 1848, (Resolves of 1848, *c.* 76,) entitled "Resolves relating to encroachments in Boston harbor," directing the attorneys of the commonwealth for the county of Suffolk, and for the northern district, to prosecute all violations of these acts.

The first and second sections of the act of 1837, *c.* 229, established a line by local objects designated from the lower South Boston Free Bridge, around the easterly and northerly sides of the city, to the abutment on the Boston side of Warren Bridge, above Charles River Bridge. The third, fourth, fifth and sixth sections of this act were as follows:

"SECTION 3. No wharf, pier or building, or incumbrance of any kind, shall ever hereafter be extended beyond the said line into or over the tide water in said harbor.

"SECTION 4. No person shall enlarge or extend any wharf or pier, which is now erected on the inner side of said line, further towards the said line than such wharf or pier now stands, or than the same might have been lawfully enlarged or extended before the passing of this act, without leave first obtained from the legislature.

"SECTION 5. No person shall in any other part of the said harbor of Boston, belonging to the commonwealth, erect or cause to be erected any wharf or pier, or begin to erect any wharf or pier therein, or place any stones, wood or other materials in said harbor, or dig down or remove any of the land covered with water at low tide, in said harbor, with intent to erect any wharf or pier therein, or to enlarge or extend any wharf or pier now erected : *provided, however,* that nothing herein contained shall be construed to restrain or control the lawful rights of the owners of any lands or flats in said harbor.

"SECTION 6. Every person offending against the provisions of this act, shall be deemed guilty of a misdemeanor, and shall be liable to be prosecuted therefor, by indictment or information, in any court of competent jurisdiction, and on conviction shall be punished by a fine not less than one thousand dollars, nor more than five thousand dollars, for every offence, and any erection or obstruction which shall be made, contrary to the provisions and intent of this act, shall be liable to be removed and abated as a public nuisance, in the manner heretofore provided for the removal and abatement of nuisances on public highways."

The first section of the act of 1840, *c.* 35, declared that the lines described in that act were thereby established as the lines of the channel of the harbor of Boston, beyond which no wharf or pier should ever thereafter be extended into and over the tide water of the commonwealth. The second section described the lines by local objects designated between the South Boston Free Bridge and the old South Boston Bridge, on each side of the channel, and also somewhat easterly of the lower bridge on the South Boston side. The third section

described the line from the Warren Bridge to the Boston and Roxbury Mill Dam, on the Boston side of the channel; the fourth section, the line on the Charlestown side of the harbor; and the fifth section, the line on the East Boston side of the harbor.

The act of 1841, *c.* 60, altered part of the line established by the act of 1840, *c.* 35, § 3, between the West Boston Bridge and the Boston and Roxbury Mill Dam.

The act of 1847, *c.* 278, established additional lines therein described. The second section described the lines of the Cambridge side of the channel of Charles River. The third section described the lines in Miller's River between Cambridge and Charlestown. The fourth section described the lines in South Bay, one of which, "drawn from a point on the south side of the south free bridge, (one hundred and fifty feet south-easterly of the south-easterly side of the draw,) in a southerly direction, parallel to the Dorchester turnpike, three thousand feet," was the line immediately affecting this case.

The acts of 1840, *c.* 35, §§ 6, 7, and 1847, *c.* 278, §§ 5, 6, contained provisions similar to the act of 1837, *c.* 229, §§ 3, 4, 5, 6, except that they contained no proviso, saving the rights of owners of land or flats in the harbor.

The indictment then averred that all the parts of the harbor of Boston, outside of and beyond the commissioners' lines, and between those lines and the high sea, were, and from the time whereof the memory of man was not to the contrary, an ancient, navigable harbor, and an ancient and common highway for all citizens of the commonwealth with their ships, vessels, lighters, gondolas, and boats, to navigate, sail, propel, row, pass, repass, and labor, at their will and pleasure: That the defendant unlawfully erected, built, and established in said harbor and highway, and extended beyond said lines, and into and over the tide water of the commonwealth, a certain superstructure, obstruction, and encumbrance, consisting of stones, timbers, piles, and earth, and made into the form and substance of a wharf or pier, of the height of ten feet, and of the form of a triangle, superficial measure, measuring on the southerly side thereof, towards the sea and south bay,

the length of forty two feet and nine inches, and on the west-
erly side thereof, upon the said harbor and highway, the
breadth of one hundred and twenty feet and four inches, and
on the easterly side thereof, bounding on the wharf and flats
of the defendant, one hundred and twenty seven feet and two
inches; and unlawfully continued and maintained the said
wharf or pier; by means whereof the navigation and free
passage of, in and over said harbor and highway had been
and were greatly obstructed, limited, and encumbered, so that
the citizens of the commonwealth navigating, &c., in, over,
and upon said harbor, with their ships, &c., could not navigate
there, upon their lawful business, and at their will and plea-
sure, in so free and uninterrupted a manner as of right they
ought, and had before been accustomed to do; to the great
damage of all the citizens of the commonwealth there navi-
gating, &c., to the great obstruction of the navigation of,
upon, and over said highway and harbor and tide water,
against the peace of the commonwealth, and contrary to the
forms of the statutes in such case made and provided.

At the trial in the municipal court before *Wells,* C. J., at
September term, 1849, the attorney for the commonwealth put
in evidence a statement agreed to and signed by himself and
the defendant, exhibiting the following facts: The defendant
is, and for more than thirty years past has been, seised of an
estate on Fourth Street in South Boston, consisting of upland
and of flats belonging thereto, just above the old South Bos-
ton Bridge, and bounding on that arm of the sea, lying be-
tween Boston proper and South Boston, in and through which
the sea ebbs and flows to and from a bay above, called South
Bay. In 1843, he began to build a wharf on his said flats,
and constructed the northerly wall thereof from his upland
nearly to the channel, and then filled in and constructed said
wharf, but did not complete it until the commissioners' line
of 1847 had been established, after which he built the triangu-
lar piece set forth in the indictment, which forms a part of the
wharf as originally commenced by him. This triangular
piece is beyond said line, but is built on the defendant's own
flats; it is not one hundred rods from the upland, is not below

low water mark, is no injury to navigation, and is not so far
beyond the commissioners' line or so near the channel as the
northerly wall of the wharf was built in 1843.

No other evidence was offered.

The defendant contended and requested the judge to rule
and instruct the jury that the evidence offered did not sustain
the indictment, and that the defendant, upon these facts, was
entitled to a verdict. But the judge refused so to rule, and
instructed the jury that on the evidence introduced, if believed,
the government were entitled to a verdict. Whereupon the
jury returned a verdict of guilty; and the presiding judge,
being of opinion that the questions of law arising in the case
were so doubtful and important as to require the decision of
this court, with the consent of the defendant, reported the case
for the purpose of presenting those questions.

The case was argued at March term, 1850.

*S. D. Parker,* county attorney, for the commonwealth. The
acts passed by the legislature to preserve the harbor of
Boston, are constitutional and valid. The commonwealth
has sovereign dominion, jurisdiction, and ownership over the
sea-shore. Such rights are recognized by the law of nature
and of nations, the Roman law, the common law of England,
and the statutes and judicial decisions of Massachusetts.
See Taylor's Civil Law, (3d ed.) 471, 472; Angell on Tide
Waters, (2d ed.) 20, 37; *Attorney General* v. *Richards,* 2
Anstr. 603; *Bennett* v. *Boggs,* Bald. 60; *New Orleans* v.
*United States,* 10 Pet. 662; *Pollard* v. *Hagan,* 3 How. 212.
The sovereign may abate every intrusion on the sea-shore,
whether the same be a nuisance to navigation or not. Angell
on Tide-Waters, (2d ed.) 198, 200; Hale *de Jure Maris,* in 1
Hargrave's Law Tracts, 85; *Attorney General* v. *Richards,* 2
Anstr. 603, 606; *Attorney General* v. *Johnson,* 2 Wils. Ch. 87,
101; *The King* v. *Tindall,* 6 Ad. & El. 143; *Commonwealth* v.
*Wright,* Thach. Cr. Ca. 211, and 3 Am. Jur. 185; *Respublica* v.
*Caldwll,* 1 Dall. 150; 2 Story on Eq. §§ 920, & seq. In the
Massachusetts colony ordinance of 1641, the right of navigation
is expressly reserved. And see *Parker* v. *Cutler Milldam Co.* 7
Shep. 353, 357; *Sale* v. *Pratt,* 19 Pick. 191; *Storer* v. *Freeman*

6 Mass. 435; *Commonwealth* v. *Charlestown*, 1 Pick. 180; *Bar-ker* v. *Bates*, 13 Pick. 255; *Austin* v. *Carter*, 1 Mass. 231; 2 Dane Ab. 700.   The legislature have express authority by the con-stitution to pass all manner of wholesome and reasonable laws for the public good; Const. of Mass. part 2, c. I. § 1, art. 4; and the preservation of the harbor of Boston is a mat-ter of great public interest.

These statutes do not take private property for public uses, without making compensation, within the meaning of the Declaration of Rights, art. 10.     They do not deprive the defendant of his property; they only restrain him from using it in a particular way.   The legislature say to the defendant: " You may dig shell-fish, but you shall not build wharves." It is an exercise of part of the power to make police regula-tions, fully recognized by this court, in *Commonwealth* v. *Tewksbury*, 11 Met. 55.

*B. R. Curtis* and *C. A. Welch*, for the defendant.     The defendant does not contend that the act in question is void, but that it is inoperative as against him, because it would impair the obligation of the contract contained in the grant, under which he holds these flats.

Certain positions are clear: (1.) The defendant holds these flats by a lawful seisin in fee simple, under a grant from the colony, made by the ordinance of 1641.   (2.) A grant is an executed contract, and every right embraced in the grant, is protected by that clause in the constitution of the United States, which prohibits any state from passing any law im-pairing the obligation of a contract.   Const. U. S. art. 1, § 10; *Fletcher* v. *Peck*, 6 Cranch, 87; *Terrett* v. *Taylor*, 9 Cranch, 43, 50; *Green* v. *Biddle*, 8 Wheat. 1; *Wilkinson* v. *Leland*, 2 Pet. 627, 657; *Rehoboth* v. *Hunt*, 1 Pick. 224; *Pike* v. *Dyke*, 2 Greenl. 213.   This provision of the constitution extends not only to the soil, but also to every incidental right essential to its enjoyment.   *People* v. *Platt*, 17 Johns. 195, 215.   (3.) Grants made before the constitution was adopted, are pro-tected by it.   *Dartmouth College* v. *Woodward*, 4 Wheat. 518.

These defendants then holding under a grant from the

colony, and every right embraced in that grant being protected, this question arises: Are the prohibitions contained in this statute consistent with every right embraced in the grant? The prohibitions are against placing any wharf, pier, building, or encumbrance of any kind, at any time, on this land. To determine whether these prohibitions are consistent with every right embraced in the grant, we must look at the nature of the thing granted. It is land, granted in fee; but it is land of a peculiar kind, twice in twenty four hours covered by the tide, not susceptible of any cultivation, yielding no products, not susceptible of being enjoyed as land in fee, but by placing upon it some wharf, pier, building, or other encumbrance. As to the right of digging shell-fish, alluded to by the attorney for the commonwealth, that has been recently decided by this court to be a public right. *Weston* v. *Sampson*, Plymouth, October term, 1849, not yet reported. It has been judicially determined that the object of the grant of the flats, was to enable the grantee to build wharves and piers thereon. *Storer* v. *Freeman*, 6 Mass. 435, 438; *Sparhawk* v. *Bullard*, 1 Met. 95, 108. He who grants a thing, grants impliedly all that is necessary to the enjoyment of that thing; and this principle extends to grants made by the law. Co. Lit. 56, a; *Darcy* v. *Askwith*, Hobart, 234; *Saunders's Case*, 5 Co. 12; *Liford's Case*, 11 Co. 46, 50; 1 Wms. Saund. 323, note (6.) The word "propriety," of itself, is enough to show how broad the grant was; and the right to build wharves is granted by clear implication. The prohibitions contained in the statute of 1847 are therefore inconsistent with the rights embraced in the grant.

But it is said that the object of this prohibition is to protect the harbor of Boston, that the navigability of the harbor is a public right, and that the state has power to preserve it, by restraining private owners from building into it, beyond the prescribed line. Certainly the state has this power, but if the exercise of it interfere with any vested rights embraced in the grant, the state must make compensation. The state cannot interfere with vested rights, for the purpose of protecting the harbor or any other public interest, without compensation.

*Stevens* v. *Middlesex Canal*, 12 Mass. 466, 468; *Gardner* v. *Newburgh*, 2 Johns. Ch. 162, 166; *People* v. *Platt*, 17 Johns. 195, 215; *Crenshaw* v. *Slate River Co.* 6 Rand. 245; *Perry* v. *Wilson*, 7 Mass. 393; *Boston and Roxbury Mill Corporation* v *Newman*, 12 Pick. 467, 482; *Hooker* v. *New Haven and North-ampton Co.* 14 Conn. 146; *Charles River Bridge* v. *Warren Bridge*, 7 Pick. 344, 507.

It is intimated that in the grant there was excepted and re-served to the public, the right to prohibit the erection of a wharf thereon, if the benefit of the harbor should require such prohi-bition. But even an express exception, made by apt words, is void, if it extends to the whole substance of what is granted. 1 Plowd. 153; Co. Lit. 47 a; *Dorrell* v. *Collins*, Cro. Eliz. 6; Shep. Touchst. 78; and no exception is ever implied; Shep. Touchst. 78. The exception in the ordinance is: " provided, that the proprietor shall not have power to stop or hinder the passage of boats or other vessels, to other men's houses or lands." Applying the two rules above stated, this exception clearly means only that such a passage shall be preserved, not that no erection shall be made, which on a nice scientific calculation shall be thought to affect the harbor. Although " the proprietor of flats can lawfully erect nothing upon them, which will obstruct or hinder such passage," " he may build wharves extending towards the sea to the distance of one hundred rods, provided he do not thereby straiten or interrupt the passage over the water, in such manner as to consti-tute a public nuisance." By Parker, C. J., *Commonwealth* v. *Charlestown*, 1 Pick. 180, 184. And see *Austin* v. *Car-ter*, 1 Mass. 231; *Commonwealth* v. *Crowninshield*, 2 Dane Ab. 697.

There is, however, a class of cases, in which it has been held that the legislature might restrain owners of land from making certain uses of their property, and might authorize acts which caused damage to property, without making com-pensation. But these cases do not depend upon any power reserved to the public, to do any thing in conflict with the grant, or in derogation of any right acquired by the grant; but each case turns on the question, whether the particular

thing done or prohibited was a violation of any right acquired by the grant. This is a very important distinction.

In *Hollister* v. *Union Company*, 9 Conn. 436, commented on and explained in *Hooker* v. *New Haven & Northampton Company*, 14 Conn. 146, 160, the question was only, whether the plaintiff had, by the grant of a right of way, any right to be secured against the effects of improvements in navigation. If he had, he could have recovered. See *Henly* v. *Lyme*, 5 Bing. 91. The case in 9 Conn. rests on the principle recognized in *Callender* v. *Marsh*, 1 Pick. 418, 431. It does not depend on the public nature of the encroaching right; the principle would be the same, if that right were private. *Thurston* v. *Hancock*, 12 Mass. 220; *Callender* v. *Marsh*, 1 Pick. 418, 434; *Wyatt* v. *Harrison*, 3 B. & Ad. 871; *Dodd* v. *Holme*, 1 Ad. & El. 493; *Partridge* v. *Scott*, 3 M. & W. 220; *Lasala* v. *Holbrook*, 4 Paige, 169. In all these cases, the only question was, whether any right of the plaintiff was infringed; and it was held there was not, because the defendant was doing on his own soil, or by virtue of his right of way, what he had previously acquired a lawful title to do. They have no tendency to show that there was reserved to the public the right to prohibit the plaintiff from making that use of his own soil, which he had, by grant from the government, a lawful right to make. That is a very different question, for there a vested right is infringed. See *Stackpole* v. *Healy*, 16 Mass. 33, 37.

*Lansing* v. *Smith*, 8 Cow. 146, only went to the extent of holding, that the public might regulate the right of navigation by authorizing erections on the land retained by them at the time of the grant to the plaintiff, although, by so doing, they incidentally interfered with the access to the land so granted; not that they might prohibit him from building a wharf on the grant. In *Vanderbilt* v. *Adams*, 7 Cow. 349, 351, a statute authorizing the harbor-masters to regulate the position of vessels in certain waters, was held valid as a police regulation.

In *Baker* v. *Boston*, 12 Pick. 184, it was held that, by the action of the mayor and aldermen, the plaintiff's creek had been adjudged to be a nuisance; and as there could be no such thing as a right to make a nuisance, that therefore the

plaintiff could not recover. But this case is not a case of nuisance. It appears from the facts agreed that the defendant's wharf does not interfere with any public rights. The statutes on which this indictment is founded, do not go on the ground of a nuisance. The only object apparent in them is, to establish the lines of the channel, and prevent encroachments thereon. The proviso in the act of 1837, *c.* 229, § 5, shows that the legislature had then no intention to interfere with private rights; and the subsequent acts only carry out the policy of the first, and, being *in pari materia,* are to be construed as if that proviso had been inserted in them.

The case of *Coates* v. *New York,* 7 Cow. 585, 604, 605, goes further than any other. There, the plaintiffs held a grant from King William III. of land for a churchyard, and had always used it as such; but the court held, that a by-law passed by the mayor and aldermen of New York, under the authority conferred on them by statute, prohibiting burials in certain parts of the city, was not unconstitutional as applied to the plaintiffs. There may, perhaps be a sound distinction between a grant from the crown and one made by legislative authority; for the king could make no grant which would affect future legislatures. And this decision may stand on the power to prohibit a particular use, which has become a nuisance, if the grant from the public does not authorize that use. But this is a police power, to prohibit a particular use, and not every use of which the land is capable; a power to regulate, and not a power to destroy. And this cannot be done if the grant from the public, either expressly or by a necessary implication, authorizes that particular use. *People* v. *Platt,* 17 Johns. 195; *Washington Bridge Company* v. *The State,* 18 Conn. 53. In such a case, compensation must be made.

*Tewksbury's case,* 11 Met. 55, falls easily within the principles contended for. He owned the land, but he took it subject to all servitudes incident to the nature of the property, among others, to this restriction, that he should not dig away the soil or remove the stones, so as to cause or permit the water to do injury to any one. This did not depend on any exception out of the grant in favor of the public. If the land of

any private owner on the other side of the beach had been injured, he could have brought an action for the damages so occasioned.

The maxim, *sic utere tuo ut alienum non laedas,* does not apply to this case. The defendant's wharf interferes with no private rights; and how can it be said to interfere with the rights of the commonwealth, who have granted him the land for the very purpose of building a wharf upon?

Lastly, if there is any doubt in this case, the court ought to lean in favor of private rights. The general rule is in favor of upholding a law; but where the question is not whether the statute is valid, but whether it shall operate on a particular case, the leaning should be in favor of private rights; for it is not to be presumed that the legislature intended to infringe on private rights. See *Gardner* v. *Newburgh,* 2 Johns. Ch. 162, 166; *People* v. *Platt,* 17 Johns. 194, 214.

We do not doubt the power of the legislature to establish this line, or that this may be a proper case for such a line; but it must be done, if done at all, as an exercise of the right of eminent domain, and compensation made.

*Parker,* in reply. These statutes are not unconstitutional, as impairing the obligation of a contract. It is very questionable whether the colonial ordinance is in force now, *proprio vigore.* In many of the cases cited, it is spoken of rather as common law than as statute law. And it cannot be doubted, that the legislature have the power to amend the common law on any subject.

The old colony ordinance is not a grant. If every law beneficial to the subject could be treated as a contract or grant, no law could be repealed without the consent of all the citizens; or, if the voice and act of the legislature be evidence of the consent of all the citizens, then these acts are constitutional, as being founded on the consent of all parties. Most, if not all, of the cases on which the defendant relies, were cases of special statutes, and therefore do not apply to this case. If a general law constituted a grant, the legislature could not modify or repeal the license laws, the usury laws, or the banking laws. The principle contended for by the defend

ant would deprive the legislature of most of its power to make police laws.

All property is held under some conditions, among which are, that it is not to be used to another man's injury, and that the legislature may impose restrictions for the public good. Besides; the supposed grant contains a proviso, that the passage of boats or vessels to other men's houses or lands shall not be stopped or hindered. If the filling up of the defendant's wharf will have a tendency to make the harbor shallower, and stop up its channels so that, at some future time, other men will not be able to pass to their lands, it comes within the very spirit of the proviso.

The opinion was delivered at March term, 1853.

SHAW, C. J.   In proceeding to give judgment in the present case, the court are deeply impressed with the importance of the principles which it involves, and the magnitude and extent of the great public interests, and the importance and value of the private rights, directly or indirectly to be affected by it.   It affects the relative rights of the public and of individual proprietors, in the soil lying on tide waters, between high and low water mark, over which the sea ebbs and flows, in the ordinary action of the tides.

The defendant has been indicted for having erected and built a wharf over and beyond certain lines, described as the commissioners' lines, into the harbor of Boston.   The case comes before this court, upon a report of the judge of the municipal court, who, deeming the questions of law involved in the case doubtful and important, with the consent of the defendant, pursuant to the statute, reported the same for the consideration of this court.   Probably the opinion was given *pro forma*, and a verdict taken by consent, with a view to present the whole question to this court.

The case thus presented, must depend on the construction, validity, and effect of the laws in question, establishing the lines of the harbor, as they affect public and private rights ; regarding, as they do, the rights of the public in tide waters and the arms of the sea, and the nature, extent, and limits of the rights of private proprietors in flats and sea-shores.

The uncontested facts in the present case are, that the defendant was owner of land, bounded on a cove or arm of the sea, in which the tide ebbed and flowed, that he built the wharf complained of, on the flats before his said land, between high and low water mark, and within one hundred rods of his upland, but below the commissioners' line as fixed by one of these statutes; although it was so built as not to obstruct or impede navigation. This certainly presents the case most favorably for the defendant.

We may, perhaps, better embrace the several subjects involved in the inquiry, by considering,

*First,* What are the rights of owners of land, bounding on salt water, whom it is convenient to designate as riparian proprietors, to the flats over which the tide ebbs and flows, as such rights are settled and established by the laws of Massachusetts; and,

*Second,* What are the just powers of the legislature to limit, control, or regulate the exercise and enjoyment of these rights.

I. By the common law of England, as it stood long before the emigration of our ancestors to this country and the settlement of the colony of Massachusetts, the title to the land or property in the soil, under the sea, and over which the tide waters ebbed and flowed, including flats, or the sea-shore, lying between high and low water mark, was in the king, as the representative of the sovereign power of the country. But it was held by a rule equally well settled, that this right of property was held by the king in trust, for public uses, established by ancient custom or regulated by law, the principal of which were for fishing and navigation. These uses were held to be public, not only for all the king's subjects, but for foreigners, being subjects of states at peace with England, and coming to the ports and havens of England, with their ships and vessels for the purposes of trade and commerce.

The charter under which the colony was formed and settled — first, that of James I. to the Plymouth company, and subsequently that of Charles I. in 1628, reciting an assignment of part of the territory formerly granted to the Plymouth company, being all that part of said territory, which after-

6 *

wards constituted the colony of Massachusetts, to Sir Henry Roswell and his associates — did proceed to grant and confirm to Sir Henry Roswell and his associates all the said lands described, and every part and parcel thereof, and all the islands, rivers, ports, havens, waters, fishings, fishes, mines, minerals, jurisdictions, franchises, royalties, liberties, privileges, commodities, and premises whatsoever, with the appurtenances.

This charter was not merely a grant of property within the realm of England, but it contained provisions for the esta blishment of a separate dependent government under the allegiance of the king; and the government thereby constituted was invested with all the requisite civil and political powers to enable it to establish and govern the colony, and to make laws for that purpose, not repugnant to the laws of England. It was so understood and practised upon, and a species of representative government was soon ingrafted on it in practice, and so it continued, and the colony grew up and flourished under it, until the charter was formally revoked and annulled, by a decree of the English court of chancery, in 1685. This decree we may have occasion to allude to again hereafter. At present it is not necessary to trace the powers of the colonial government further. They were then regarded and have ever since been acknowledged to be ample and sufficient to grant and establish titles to land and to all territorial rights and privileges, and to govern and control all the internal concerns of the territory over which it was established. To the grants and acts of that government all titles to real property in Massachusetts, with their incidents and qualifications, are to be traced as their source.

Assuming that by the common law of England, as above stated, the right of riparian proprietors, bounding upon tide waters, extending to high water mark only, and assuming that the first settlers of Massachusetts regarded the law of England as their law, and governed themselves by it, it follows that the earliest grants of land bounding on tide waters would be to the high water line and not below it, and would have so remained, but for the colony ordinance, now to be considered.

This is commonly denominated the ordinance of 1641; but this date is probably a mistake. It is found in the Ancient Charters, 148, in connection with another on free fishing and fowling, and marked 1641, 47. That on free fishing, &c., is taken in terms from the "Body of Liberties," adopted and passed in 1641, leaving the date 1647 to apply to the other subject respecting ownership in coves, &c., about salt water. See an interesting work, Remarks on the Early Laws of Massachusetts Bay, by Francis C. Gray. 8 Mass. Hist. Soc. Coll. (3d series) 191, 215. This work contains, probably for the first time in print, a full copy of the "Body of Liberties," which, there is evidence to believe, were adopted and sanctioned by the colonial government in 1641, but were never printed entire with the colony laws, although many of them were embodied in terms in particular ordinances. But the date is quite immaterial, and the only purpose of making this explanation is to show why these two subjects, separate in their origin, were so connected together in the publication of the colony laws, that it seems necessary now to consider them together as one act.

The whole article, as it stands in the Ancient Charters and in the edition of the colony laws of 1660, is as follows:

" Sect. 2. Every inhabitant who is an householder shall have free fishing and fowling in any great ponds, bays, coves and rivers, so far as the sea ebbs and flows within the precincts of the town where they dwell, unless the freemen of the same town, or the general court, have otherwise appropriated them : provided, that no town shall appropriate to any particular person or persons, any great pond, containing more than ten acres of land, and that no man shall come upon another's propriety without their leave, otherwise than as hereafter expressed.

" The which clearly to determine; Sect. 3. It is declared, that in all creeks, coves, and other places about and upon salt water, where the sea ebbs and flows, the proprietor, or the land adjoining shall have propriety to the low water mark, where the sea doth not ebb above a hundred rods, and not more wheresoever it ebbs further : provided, that such proprietor

shall not by this liberty have power to stop or hinder the passage of boats or other vessels, in or through any sea, creeks, or coves, to other men's houses or lands.

" Sect. 4. And for great ponds lying in common, though within the bounds of some town, it shall be free for any man to fish and fowl there, and may pass and repass on foot through any man's propriety for that end, so they trespass not upon any man's corn or meadow.   [1641, 47.] "

In analyzing this ordinance, which thus appears as one act, it appears that that part of it which relates to free fishing and fowling in all great ponds, and in creeks, coves, and rivers, where the sea ebbs and flows, was taken word for word from the " Body of Liberties," § 16, but no mention is made in that collection, of the rights of proprietors to low water mark. The latter provision, together with one declaring what should be deemed great ponds, was probably passed afterwards, in 1647.   The subjects being connected together would, according to the usage of the time, be connected together as one article in the subsequent editions of the laws; and this consideration shows the relation of these subjects to each other, and the fitness of connecting them together when published, for the information of the colonists.

The great purpose of the 16th article of the " Body of Liberties" was to declare a great principle of public right, to abolish the forest laws, the game laws, and the laws designed to secure several and exclusive fisheries, and to make them all free.   It expressly extended this right to places in which the tide ebbs and flows, then public domain, open to all.   But when there afterwards came a provision, in effect declaring this territory, between high and low water mark, the private property of the riparian proprietor or owner of the upland; this would seem to take away or abridge the right to the use of the shores, previously given; but this was accompanied by another, that, for fowling and fishing, persons may pass over another man's property, of course including these shores thus made private property; this restores the public right to pass on foot over flats or places over which the sea ebbs and flows, so long as they are not actually reclaimed and converted into tillage or mowing land.

Such being the terms of the colony ordinance, and such the state and condition of the law when it was passed, and taking into consideration the condition and circumstances of the colony at the early period at which it was adopted the material question is, what was its legal effect and operation ?

In construing this ordinance heretofore, and applying it to particular cases, courts have frequently had occasion to remark upon the difficulties and embarrassments attending its construction. But these have referred mainly, not to the question, what estate the riparian proprietor takes in flats acknowledged to belong to his upland, but to difficulties in determining, from the generality of the terms of the ordinance, and peculiar local circumstances, what particular flats do belong to any particular parcel of upland, arising from the line and conformation of the shore on which they lie, whether straight or curved, whether curved inward or outward, direct or having points or promontories, or broad or narrow indentations, or arising from the formation of the flats over which the sea ebbs and flows, the direction of the current, and the relative position of the flats to the channel or deep water, beyond which the sea doth not ebb. *Adams* v. *Frothingham*, 3 Mass. 352 ; *Rust* v. *Boston Mill Corporation*, 6 Pick. 158 ; *Valentine* v. *Piper*, 22 Pick. 85 ; *Sparhawk* v. *Bullard*, 1 Met. 95 ; *Piper* v. *Richardson*, 9 Met. 155 ; *Walker* v. *Boston & Maine Railroad*, 3 Cush. 1, 22 ; *Gray* v. *Deluce*, 5 Cush. 9, 12. These are some of the principal cases in which these difficulties, which are intrinsic and unavoidable, have been alluded to ; and they all arose, so far as this point was concerned, in applying the rule to particular cases, in order to ascertain whether the flats in controversy did or did not belong to the particular parcel of upland for which they were claimed. We mention them for the purpose of laying them out of the case, as having no bearing upon the present question.

Taking the terms of the ordinance, with a long course of judicial decisions upon its construction, nearly if not quite uniform, the court are of opinion that the antecedent law limiting the right of private proprietors of land bounding on

the sea or salt water, to the line of high water, was changed
by it; that, after this ordinance, the grant of lands, so situated,
by the colonial government to individuals, or to proprietors
of townships or companies of settlers, through whom they
came to individuals, vested in such grantees an estate in fee
in the land lying between high and low water mark, subject
to the restriction expressed in the proviso, "so as not to stop
or hinder the passage of boats and vessels," &c., and subject to
all such restraints and limitations of absolute dominion over
it, in its use and appropriation, as other real estate is sub-
ject to, for the security and benefit of other proprietors, and
of the public, in the enjoyment of their rights.

Before proceeding to state these limitations and exceptions,
and for the better understanding of them, it may be useful to
state the grounds of our opinion in regard to the rule itself.
The language of the ordinance, though quaint and peculiar,
as might be expected in so ancient a document, seems yet to
be clear and intelligible.   The word "propriety" is nearly, if
not precisely, equivalent to "property."   It imports not an
easement, an incorporeal right, license, or privilege, but a *jus
in re*, a real or proprietary title to, and interest in, the soil
itself, in contradistinction to a usufruct, or an uncertain and
precarious interest.   A suggestion has somewhere been made,
founded on the use of the word "liberty" in the proviso —
"provided, that such proprietor shall not by this *liberty* have
power to stop or hinder the passage of boats," &c. — and
thence drawing an inference, that the whole ordinance was
intended to confer only a license or permission, liable to be
revoked or withdrawn by the power which conferred it.   But
it is manifest that the word was not so used in this proviso.
The term "liberties" was used as synonymous with laws, or
legal rights founded and established by law.   In the published
edition of the colony ordinances, generally, they are denomi-
nated the Laws and Liberties.   The code already alluded to
as having been accepted and adopted in 1641, was called the
"Body of Liberties."   It is said by Hutchinson, that they
were composed by Rev. Nathaniel Ward, of Ipswich, who, he
adds, had been a minister in England, and formerly a student

and practiser in the course of the common law. 2 Winthrop's Journal, 55. They bear intrinsic evidence of having been drawn with great skill and legal accuracy, and have a constant reference to the established principles of the laws of England Yet they were called Liberties. Perhaps this was advisedly done, because the colonial government were acting under a charter which made them a corporation; and although it conferred on the governor and company large powers to govern the settlement which they might establish, yet it was always so as " not to be repugnant to the laws of England." It might seem to them less arrogant to set forth and declare their " liberties" and rights in this form, than to enact in terms a body of laws, which might seem to indicate a disregard of the authority of the mother country. This use of the term " liberty," as synonymous with right, franchise, and privilege, is strictly conformable to the sense of the term as used in *Magna Charta*, in the Declaration of Rights, and in English statutes, grants, and legal instruments. Jacob's Law Dict. Tit. Liberty.

But, however this may be, we think it manifest, from the whole tenor of their legislation, that when the early settlers of Massachusetts, holding their lands under the freest and most liberal English tenure, that of tenants in fee simple in free and common socage, were making provision for granting and taking titles to real estate for themselves and their posterity, and when a certain valuable right and interest was annexed to and made part of such grants of estate by the government competent to impress such character upon it, they understood, both those who made and those who proceeded to take titles and settle the country under such grants, that the grantees acquired a legal right and vested interest in the soil, and not a mere permissive indulgence, or gratuitous license, given without consideration, and to be revoked and annulled at the pleasure of those who gave it.

We think this is confirmed by the use of the word " propriety," as used in two other places in the same ordinance. In the section immediately preceding the provision respecting flats, " no man shall come upon another's *propriety* without

their leave," &c., clearly meaning land. So, in a succeeding section, " may pass and repass on foot through any man's *propriety,* so they trespass not on any man's corn or meadow." Here it obviously means his real estate, his farm, including its most valuable part, his tillage and mowing lands. The word " propriety " is used in the same sense by Lord Hale, and many other writers of that period, and is obviously a translation of the Latin word "*proprietas,*" Latin being the language then chiefly used in legal writings and proceedings. Yet it is the term " propriety," in the enacting clause, which is called " this liberty" in the proviso. We think it is therefore impossible, from this casual use of the word liberty in the proviso, to infer that it was intended to give a gratuitous permission or license to the riparian proprietor to make a temporary or casual use of the flats adjoining his upland; and we think it was intended to declare a general rule of property, in regard to all real estate, bounded upon tide waters, annexing a new and additional right of soil in the shore, subject to the restrictions above mentioned.

And we believe that the course of judicial decision, so far as it can now be ascertained, tends to confirm the opinion, that, after the adoption of the colony ordinance, all riparian proprietors had a fee in the flats adjoining their land, over which tide waters ebbed and flowed, until severed by some deed or act of the owner, competent to convey or transfer real estate. We are not aware of any adjudication upon this subject prior to the revolution; and it is highly probable that the right was not drawn in question for many years, in the courts of justice. On the greater part of the coasts and shores, the bays and inlets of salt water, the right was for a long period, and in regard to many of them still is, of no value, and of course would not be the subject of litigation. It is only in and near populous towns, and frequented ports and harbors, and in consequence of the exigencies of navigation and commerce, that the lands flowed by the tides become useful and valuable. In Boston, which was for a long time the principal port of the colony, navigation was confined mostly to the cove lying on the easterly side of the town,

lying on a circular shore, and in regard to this, an arrange-
ment was made by a mutual agreement, between the colonial
government and the riparian proprietors within the cove in
1674, by which a cross wharf was erected on the outside from
one point of this circular cove to the other, to be used partly
for the purposes of commerce, but mainly as a barricade to
serve as a defence against an apprehended attack of the Dutch
from Manhadoes; a barricado, in the spirited language of the
time, to play guns upon.  *Conventio legem vincit;* this com-
pact fixed the limits of the rights of the proprietors to flats
within the cove, and left no room for question.  Whatever
force and effect may have since been attributed to the barri-
cado agreement, it was long regarded as of binding force,
regulating the rights of riparian proprietors within the cove
It is perhaps now of no other importance, than as it accounts
for the fact, that there was no litigation or judicial decision,
in regard to the rights of riparian proprietors, in that part of
the principal port in which they would have been most likely
to occur.

Since lands of this description have become valuable, the
subject has often been brought before the courts, but as there
were no regular reports published prior to 1804, it is difficult
to trace the law to an earlier time, except as it was declared
by those judges and jurists, whose memory and traditional
knowledge extended to an anterior period.  We will cite a
few of them.

Mr. Sullivan, in his History of Land Titles in Massachu-
setts, published in 1801, alludes to the subject, cites the colony
ordinance, and treats it as having effected a great change of
the law of Massachusetts, in regard to the right of property
in the soil in navigable waters, where the sea ebbs and flows.
Sullivan, 284.  Mr. Dane, who may be considered as a lawyer
of the old school, and who had devoted many years of his
life to the study and exposition of the laws of Massachusetts,
treats this subject more at large.  2 Dane Ab. 694.  After
citing the usual authorities to show, that by the common law
the property in the soil of land over which the tide ebbs and
flows was in the king, he proceeds to state that the statute

laws in this state have made several material alterations in some of these subjects. He cites the colony ordinance at large, and says this old and important law is now constantly practised upon, in regard to harbors, beaches, flats-grounds, and wherever the tide ebbs and flows, as well respecting fishing and flowing, as the right of soil. And he adds, many actions have depended on this law, and instances real actions to recover the soil or ground where the tide ebbs and flows, whenever taken possession of and claimed by another. This is perhaps the best evidence now to be obtained of what the law was, prior to the regular publication of reports, showing that the rule of the colony ordinance was recognized and practised upon, extending the right of riparian proprietors to low water mark, which at common law they had to ordinary high water mark, which was a title in fee. Mr. Dane cites two cases, in which this rule was considered and applied; *Commonwealth* v. *Pierce*, S. J. C., Essex, November, 1790; *Commonwealth* v. *Crowninshield*, S. J. C., Essex, November, 1796.

The first reported case on this subject is that of *Austin* v. *Carter*, 1 Mass. 231. Though the report is exceedingly brief, which is much to be regretted, yet the judgment is quite decisive on several points: First, that the owner of land bounding on tide waters, has property in the flats to low water mark, and may maintain trespass *quare clausum*, against any one who shall enter and cut down piles placed there by the owner, with a view to build a wharf, or otherwise inclose the flats: Second, that although the owner has a right to build on his flats and exclude all mankind, yet until he does so build, or erect some structure which may exclude others, and whilst the tide is up, and the land covered with salt water, every townsman, and every other person, has a right to pass through and over the same, with boats or vessels, and commits no trespass upon the owner in doing so.

Upon this last point, we may as well remark here, that the right of the riparian proprietor, under the ordinance, has always been held subject to this rule; that until he shall build upon his flats or inclose them, and whilst they are covered

with the sea, all other persons have the right to use them for the ordinary purposes of navigation. This probably results from the general and acknowledged right of the public to navigate the sea and all its arms and branches; and so long as the owner of the flats permits the sea to flow over them, the individual right of property in the soil beneath does not restrain or abridge the public right to the appropriate use of them.

Mr. Dane intimates, (2 Dane Ab. 700,) that the case of *Austin* v. *Carter* goes too far, in stating that the riparian proprietor has an absolute right under the colony law, so to build to low water mark and exclude all mankind. But it is to be considered, that the court gave no opinion; affirming only in general terms the doctrine advanced by the defendant's counsel. No qualification, therefore, to the general rule was expressed, not even the limitation to one hundred rods, or the condition not to hinder the passage of boats and vessels, &c. And further, this judgment must be construed according to the subject matter, which was, the right to flats then in controversy, belonging to land adjoining Charles River, at or near the old ferry way, between Charlestown and Boston, where the river was broad, and where the channel or deep part of the river was quite wide, and afforded abundant room for any boats or vessels to pass along the river and to other men's houses and lands. Had the court been giving an opinion in regard to flats differently situated, there is no reason to doubt that they would have qualified it by stating the proper conditions and limitations. The court were unanimous, and consisted of Dana, C. J., Strong, Sewall, Sedgwick, and Thatcher, Js.

The next case to which we would refer is that of *Storer* v. *Freeman*, 6 Mass. 435. It is to be remarked that this case concerned a parcel of flats, lying between high and low water mark, at Cape Elizabeth, in the county of Cumberland, Maine, and that the province of Maine was not within the jurisdiction of the colony of Massachusetts when the ordinance was passed, so as to be directly bound by its legal enactments. This circumstance is not taken notice of by the court, nor is

it material; for it may as well be remarked here as any where else, that the rule or principle of the colony ordinance, having been adopted and practised on in every part of the province of Massachusetts, after the union of the colony of Massachusetts with Plymouth and Maine, and also with Nantucket and Martha's Vineyard, by the province charter of 1692, the same rule, extending riparian ownership to low water mark, is now held to extend to all these territories. *Codman* v. *Winslow,* 10 Mass. 146 ; *Barker* v. *Bates,* 13 Pick. 255 ; *Mayhew* v. *Norton,* 17 Pick. 357 ; *Lapish* v. *Bangor Bank,* 8 Greenl. 85. It has also been held that the same rules apply as well to the shores of the open sea as to those of coves, creeks, and arms of the sea. *Barker* v. *Bates,* 13 Pick. 255 ; *Sale* v. *Pratt,* 19 Pick. 191.

It was remarked by the court in the case of *Storer* v. *Freeman,* that the colony ordinance was annulled with the charter, by the authority of which it was made. The strict correctness of this remark may perhaps be doubted, even though the decree in chancery of 1685, by which the charter was adjudged forfeited, were regular and valid, which we believe has never been admitted here. In general, a revolution or change in the form of political government does not annul the municipal laws regulating property, or divest rights of property acquired under them. If the remark was intended only to intimate that the *jus publicum,* the right of governing, controlling, and regulating the sea and sea-shores, and the powers and prerogatives of the king for the protection of public rights, which had been transferred to the colonial government by the charter, would be taken away by a valid revocation of that charter, without affecting private rights already vested, it may be admitted to be correct. But, however that may be, it has become a mere question of speculation, and ceased to be of any practical importance, even within the old territory of the colony of Massachusetts, because the same rights and powers, and all doings under the charter, were revived and confirmed by the province charter; and by the very first act under the provincial government, making a temporary provision; and by a subsequent act, passed soon after, continuing

the former in force and making it perpetual, it was declared that all the local laws made by the late governor and company of Massachusetts Bay and New Plymouth, do remain and continue in force in the respective places for which they were made. Ancient Charters, 213, 229.

The case of *Storer* v. *Freeman* is of high authority as a precedent, and has a strong bearing upon the question we are discussing. The opinion was given by Parsons, C. J. It had been argued that the ordinance had annexed the flats to the upland rather as an appurtenance than as an extension of the limits of the owner's land. The court first state, that, by the common law of England, the owner of land bounded on the sea, or on any arm of the sea where the tide ebbed and flowed, could not by such boundary hold any land below the ordinary high water mark, for all the land below belonged of common right to the king; but the subject might claim the land below high water mark against the king, either by grant or prescription. They then add, that to induce persons to erect wharves below high water mark, which were necessary to the purposes of commerce, the common law of England was altered by an ordinance providing that the proprietor of land adjoining on the sea or salt water, shall hold to low water mark, where the tide does not ebb and flow more than one hundred rods; but that the rights of others to convenient ways are saved. This case decides that the flats are held by the riparian proprietor, subject to an easement for a convenient right of way; that he takes them as land, and not as an incorporeal right; and that whether they pass or not by a particular conveyance, depends on the question, whether they are included in the description so as to pass as parcel. The same points were decided in another case which soon followed. *Codman* v. *Winslow*, 10 Mass. 146.

The next case to which we would refer, is that of *Commonwealth* v. *Charlestown*, 1 Pick. 180. The whole of this case is very instructive. Several points are decided, which we will state without stating the case at large.

1. That by the common law the right of the soil of the shore between the high and low water mark, and all arms of

7 *

the sea, coves, and creeks, where the tide ebbs and flows, are the property of the sovereign, unless appropriated to some subject by grant, or prescription which presupposes a grant.

2. That by the letters patent and charter of Charles I., all right in the waters and shores of the sea was transferred to the company who undertook the settlement of the colony of Massachusetts, who were thereby made a body politic, giving them absolute property in the land within the limits of the charter, the power of making laws for the government of the colony, and full dominion over all the ports, rivers, creeks, and havens, in as full and ample a manner as they were before held by the crown of England; and that by these charters, the acceptance of them, and proceedings under them, the people of the colony, in their politic capacity, succeeded to all the territorial rights, franchises, and immunities, which had ever belonged to the sovereign power of the parent country.

3. That among the earliest acts of legislation was an exer· cise of sovereignty with respect to the shore or flats of coves, creeks, &c., which abounded all over the coast. The desire and necessity for wharves, quays, and piers, were soon felt by individuals and the community, and to encourage them, the government transferred its property in the shore of all creeks, coves, and other places upon the salt water where the sea ebbs and flows, giving to the proprietor of the land adjoining, the property of the soil to low water, not exceeding one hundred rods. This was a grant of so much of the shore, &c.

4. That the exceptions and provisions in this ordinance show clearly that the principles of the common law, relating to this kind of property, were well understood by the colonial legislature. By this grant of the property, those who acquired it were restricted from such a use of it as would impair the public right of passing over the water in boats and other vessels, through any sea, creeks, or coves, to other men's houses or lands. The result is that the ordinance made no alteration in the use of places there described, while they are covered with water; and further, that the proprietor of the flats can lawfully erect nothing upon them which will obstruct or hinder such passage, though he may build wharves towards the sea, if he

do not thereby straiten or interrupt the passage over the water so as to constitute a public nuisance.

5. That none but the sovereign power can authorize an interruption of such passages, because it has power to judge of what the public convenience requires, and may enact conditions to preserve the natural passages; that all navigable rivers are public property, for the use of all the citizens; and that there must be some act of the sovereign power, direct or derivative, to authorize any interruption of them.

The views, we believe, that the courts of this state have constantly taken of the construction of the colony ordinance, are these: That it vested the property of the flats in the owner of the upland in fee, in the nature of a grant; but that it was to be held subject to a general right of the public for navigation until built upon or inclosed, and subject also to the reservation that it should not be built upon or inclosed in such manner as to impede the public right of way over it for boats and vessels. We are not aware that this has been drawn in question by any judicial decision; but on the contrary we think that this construction has been uniformly recognized, adopted, and applied, as occasion has required. Instead, therefore, of pursuing this analysis of the cases further, we will enumerate some of the most important of them, coming down to the latest period. *Rust* v. *Boston Mill Corporation*, 6 Pick. 158; *Valentine* v. *Piper*, 22 Pick. 85; *Gray* v. *Bartlett*, 20 Pick. 186; *Sparhawk* v. *Bullard*, 1 Met. 95; *Ashby* v. *Eastern Railroad*, 5 Met. 368; *Piper* v. *Richardson*, 9 Met. 155; *Drake* v. *Curtis*, 1 Cush. 395; *Walker* v. *Boston & Maine Railroad*, 3 Cush. 1; *Gray* v. *Deluce*, 5 Cush. 9.

The same principles have been affirmed by a series of decisions of the supreme court of Maine, and the circuit court of the United States in Maine, holding that the principles of the Massachusetts colony ordinance have been established by usage and adoption, and long held as the common law of that state. *Knox* v. *Pickering*, 7 Greenl. 106; *Dunlap* v. *Stetson*, 4 Mason, 349, 366; *Lapish* v. *Bangor Bank*, 8 Greenl. 85; *Emerson* v. *Taylor*, 9 Greenl. 42; *Deering* v. *Long Wharf*, 12 Shep. 51, 64.

There is another view of the subject, leading to the same result, arising from the established remedies for any injury or damage done to this species of property.   The following cases, though they do not bear directly upon the main question, do, by necessary implication, involve the conclusion, that flats, are deemed to be land and real estate, and not an appurtenance or incorporeal right.

1.  That a writ of entry — a remedy exclusively appropriated to the recovery of lands — will lie for flats, though uninclosed by the owner, if he be disseised of them, as he may be by actual possession of them being taken by another.

2.  That trespass *quare clausum fregit* lies for any injury done to the owner's lawful possession of flats — a remedy wholly inapplicable to the disturbance of an easement or incorporeal right.

3.  That flats will not pass as appurtenant to land, because it is an established rule that land cannot pass as appurtenant to land, although it may pass as appurtenant to a messuage; but it would pass, although land, as appurtenant to a wharf.[*] *Doane* v. *Broad Street Association*, 6 Mass. 332.

4.  That the upland and flats may be severed by the owner, at his pleasure; he may aliene the flats or any part of them without the upland, or the upland without the flats; and it will depend on the descriptive terms of the conveyance, embracing or excluding them, whether any and what part of them will pass.   *Lufkin* v. *Haskell*, 3 Pick. 356.

We have thought it proper to examine, with some care, the foundation, on which the right of property in land, situated between high and low water mark in Massachusetts, rests, though it has not been much contested in reference to these harbor lines, except indirectly, and in vague and general terms. And we think it is entirely clear that, since the adoption of the colony ordinance, every grant of land, bounding upon the

---

[*] It has been decided, in a modern case in England, that land on the shore, in front of a wharf, does not pass by a demise of the wharf, because one piece of land cannot, in point of law, be appurtenant to another.   But it does not affect the authority of the case cited, on the point for which it is referred to   *Buszard* v *Capel*, 8 B. & C. 141.

sea, or any creek, cove, or arm of the sea, and either in terms including flats to low water mark, or bounding the land granted on the sea or salt water, with no terms limiting or restraining the operation of the grant, and where the land and flats have not been severed by any intervening conveyance, has had the legal effect to pass an estate in fee to the grantee, subject to a limited right of way for boats and vessels. We have seen that the entire right of property in the soil was granted by the charter to the colonists, with a full power of disposal, and that the colonial government was clothed with so much of the royal prerogative and power, as was necessary to maintain and regulate all public rights and immunities in the same. If land so situated had, previously to the ordinance, been conveyed by the government, to companies of proprietors or individuals, the act was in the nature of a grant of the flats to such prior grantees. It is said that it was not of itself a grant, but a general law affecting the character of property. Be it so. It was an authoritative declaration of owners, having a full right of property and power of disposal, annexing additional land to that previously granted, to hold in fee, subject to a reserved easement; and, if not strictly a grant, it partook of most of the characteristics of a grant, and could not be revoked by the power that gave it. In regard to all grants made by the government after the ordinance, the terms of the grant, bounding the lands granted upon the sea, or arm of the sea, or places where the tide ebbed and flowed, would, *ex vi termini,* carry a fee to low water mark, or one hundred rods; so that in one or the other alternative, this ordinance must govern and control the shore rights of riparian proprietors in every part of the commonwealth.

II. Assuming, then, that the defendant was owner in fee of the soil and flats upon which the wharf in question was built, it becomes necessary to inquire whether it was competent for the legislature to pass the acts establishing the harbor lines, and what is the legal validity and effect of those acts.

There is now no occasion and no ground to deny or question the full and sovereign power of the commonwealth, within its

limits, by legislative acts, to exercise dominion over the sea and the shores of the sea, and all its arms and branches, and the lands under them, and all other lands flowed by tide water, subject to the rights of riparian ownership. Whether any portion of this sovereignty remained in the British crown after the colonial and provincial charters were granted, it is now immaterial to inquire; for it is quite certain that the entire right of property in the soil was granted to the colonists in their aggregate capacity, and if any power remained in the crown, it was that of dominion and regulation of the public right, and this was wholly determined by the Declaration of Independence, acknowledged and acceded to by the treaty of peace, sanctioned by an act of parliament. This right of dominion and controlling power over the sea and its coasts, shores, and tide waters, when relinquished by the parent country, must vest somewhere; and, as between the several states, and the United States, whatever may have been the doubts on the subject, it is settled that it vested in the several states, in their sovereign capacity, respectively, and was not transferred to the United States by the adoption of the constitution intended to form a more perfect union. Special jurisdiction has been from time to time vested in the general government for special purposes, but the general jurisdiction remains with the several states, subject, however, to such regulations as congress may make in the exercise of their admitted powers to regulate foreign commerce, and commerce among the states. Such is the principle determined by the supreme court of the United States, the ultimate tribunal to decide questions of this kind. *New Orleans* v. *The United States,* 10 Pet. 662, 737; *Pollard* v. *Hagan,* 3 How. 212.

But the power of the commonwealth, by the legislature, over the sea, its shores, bays, and coves, and all tide waters, is not limited, like that of the crown at common law. By the common law, the king was held to be the owner and proprietor of the soil under the sea, its shores, and all tide waters, and as such could grant the right of property therein to a subject; though this was not usually done without the previous execution and return of a writ of *ad quod damnum,* to ascertain

whether such grant would cause any injury to any public right. But it was further held, at common law, that, beyond a right of property, the king's prerogative extended to the dominion and control of the shores of the sea, as a power held in trust for the security and protection of the public rights in the navigation and fisheries; that these were among the regalia or incidents of sovereignty, which could not be alienated by a royal grant alone, or held by a subject. But we believe it was never doubted that the British parliament, exercising all the powers of dominion and sovereignty, had full authority to regulate, protect, and secure all public rights; and it is under this authority, we suppose, that acts have often been passed regulating ports, harbors, and tide waters. *Lowe* v. *Govett,* 3 B. & Ad. 863; *The King* v. *Montague,* 4 B. & C. 598; *Attorney General* v. *Burridge,* and *Same* v. *Parmeter,* 10 Price, 350, 378, 412.

Supposing, then, that the commonwealth does hold all the power which exists anywhere, to regulate and dispose of the sea-shores, and tide waters, and all lands under them, and all public rights connected with them, whether this power be traced to the right of property or right of sovereignty as its principal source, it must be regarded as held in trust for the best interest of the public, for commerce and navigation, and for all the legitimate and appropriate uses to which it may be made subservient. Assuming, then, that the commonwealth does hold this power, within certain limits, the question recurs, whether the acts under consideration are within its just and legitimate exercise.

In considering this question, it becomes necessary to inquire, and ascertain as far as practicable, the nature and character of the laws in question, and the object which the legislature had in view in passing them. The first act, though not the one upon which this prosecution is founded, was passed on the 19th of April, 1837, *St.* 1837, *c.* 229, and is entitled " an act to preserve the harbor of Boston, and to prevent encroachments therein." It establishes a line by local objects designated along the easterly and northerly side of the city, from the lower South Boston Free Bridge, around to a point

above Charles River Bridge, and provides, § 3, that no wharf, pier, or building, or encumbrance of any kind, shall ever hereafter be extended beyond the said line, into or over the tide water of said harbor.

The next succeeding act was passed on the 17th of March, 1840, *St.* 1840, *c.* 35. It establishes the line of the harbor, from the lower free bridge, on the Boston side, to the old South Boston Bridge, and on the South Boston side, from the old South Boston Bridge to the Free Bridge, and thence easterly. The fourth section of the act of April 26, 1847, *St.* 1847, *c.* 278, establishing certain lines in South Bay, is the statute upon which the present prosecution is instituted. The premises of the defendant are situated on the South Boston side, immediately above the upper bridge. This act provides, § 1, that no wharf or pier shall ever be extended beyond said line into or over the tide water of the commonwealth. Section 5 reiterates this prohibition, and § 6 provides that any person, offending against the provisions of the act, shall be deemed guilty of a misdemeanor, and may be prosecuted therefor and punished, by indictment; and that any erection or obstruction, which shall be made contrary to the provisions and intent of the act, shall be liable to be removed and abated as a public nuisance. The other acts recited in the indictment, extend the line, with similar provisions, to other parts of the harbor, but do not materially affect the present question.

The manifest object of these statutes is to prevent injurious obstructions in the harbor of Boston, and to secure the free, common, and unobstructed use thereof, for the citizens of the commonwealth, and all other persons, for navigation with ships, boats, and vessels of all kinds, as a common and public right. If this can be done, without an unwarrantable encroachment on the rights of private property, it is an object of great importance, and one in which the holders of riparian rights, as well as all other holders of real estate, and the whole community, have a deep and abiding interest.

We think it is a settled principle, growing out of the nature of well ordered civil society, that every holder of property, however absolute and unqualified may be his title, holds it

under the implied liability that his use of it may be so regu-
lated, that it shall not be injurious to the equal enjoyment
of others having an equal right to the enjoyment of their
property, nor injurious to the rights of the community. All
property in this commonwealth, as well that in the interior
as that bordering on tide waters, is derived directly or indi-
rectly from the government, and held subject to those general
regulations, which are necessary to the common good and
general welfare. Rights of property, like all other social and
conventional rights, are subject to such reasonable limitations
in their enjoyment, as shall prevent them from being injurious,
and to such reasonable restraints and regulations established
by law, as the legislature, under the governing and controlling
power vested in them by the constitution, may think necessary
and expedient.

This is very different from the right of eminent domain, the
right of a government to take and appropriate private pro-
perty to public use, whenever the public exigency requires it;
which can be done only on condition of providing a reason-
able compensation therefor. The power we allude to is rather
the police power, the power vested in the legislature by the
constitution, to make, ordain and establish all manner of
wholesome and reasonable laws, statutes and ordinances,
either with penalties or without, not repugnant to the consti-
tution, as they shall judge to be for the good and welfare of
the commonwealth, and of the subjects of the same.

It is much easier to perceive and realize the existence and
sources of this power, than to mark its boundaries, or pre-
scribe limits to its exercise. There are many cases in which
such a power is exercised by all well ordered governments,
and where its fitness is so obvious, that all well regulated
minds will regard it as reasonable. Such are the laws to pro-
hibit the use of warehouses for the storage of gunpowder
near habitations or highways; to restrain the height to which
wooden buildings may be erected in populous neighborhoods,
and require them to be covered with slate or other incombus-
tible material; to prohibit buildings from being used for
hospitals for contagious diseases, or for the carrying on of

noxious or offensive trades; to prohibit the raising of a dam, and causing stagnant water to spread over meadows, near inhabited villages, thereby raising noxious exhalations, injurious to health and dangerous to life.

Nor does the prohibition of such noxious use of property, a prohibition imposed because such use would be injurious to the public, although it may diminish the profits of the owner, make it an appropriation to a public use, so as to entitle the owner to compensation. If the owner of a vacant lot in the midst of a city could erect thereon a great wooden building, and cover it with shingles, he might obtain a larger profit of his land, than if obliged to build of stone or brick, with a slated roof. If the owner of a warehouse in a cluster of other buildings could store quantities of gunpowder in it for himself and others, he might be saved the great expense of transportation. If a landlord could let his building for a smallpox hospital, or a slaughter-house, he might obtain an increased rent. But he is restrained; not because the public have occasion to make the like use, or to make any use of the property, or to take any benefit or profit to themselves from it; but because it would be a noxious use, contrary to the maxim, *sic utere tuo, ut alienum non lædas.* It is not an appropriation of the property to a public use, but the restraint of an injurious private use by the owner, and is therefore not within the principle of property taken under the right of eminent domain. The distinction, we think, is manifest in principle, although the facts and circumstances of different cases are so various, that it is often difficult to decide whether a particular exercise of legislation is properly attributable to the one or the other of these two acknowledged powers.

These principles were somewhat discussed, and similar views were substantially adopted, in the case of *Commonwealth* v. *Tewksbury,* 11 Met. 55. Perhaps the facts in that case were imperfectly stated, or some of the positions and illustrations were expressed in too broad and unqualified a manner; but we are of opinion that the principle on which that judgment proceeded was correct. It assumes that all real estate, inland or on the sea-shore, derived immediately or

remotely from the government of the state, is taken and held under the tacit understanding that the owner shall so deal with it as not to cause injury to others; that when land is so situated, or such is its conformation, that it forms a natural barrier to rivers or tidal watercourses, the owner cannot justifiably remove it, to such an extent as to permit the waters to desert their natural channels, and overflow, and perhaps inundate fields and villages, render rivers, ports and harbors shallow, and consequently desolate, and thereby destroy the valuable rights of other proprietors, both in the navigation of the stream, and in the contiguous lands. It expresses nearly the same legal truth, which is expressed in the familiar maxim, that no owner, through whose land a natural watercourse runs, can lawfully divert it to the damage of others. But what is the diversion of a watercourse? Ordinarily, and when no such circumstances exist, the owner of land has a perfect right to use and remove the earth, gravel and clay of which the soil is composed, as his own interest or convenience may require. But can he do this when the same materials form the natural embankment of a watercourse? He may say, perhaps, that he merely intends to make use of materials which are his own, and to which he has a right, and for which he has other uses. But we think the law will admit of no such excuse; he knows that, when these materials are removed, the water, by the law of gravitation, will rush out, and all the mischievous consequences of diverting the watercourse will follow. He must be presumed to have intended all the necessary and natural consequences of his own acts; of course that he intended, by those acts, to divert the watercourse; and the law holds him responsible for them accordingly. Principles are tested by taking extreme cases. Take the case of the river Mississippi, where large tracts of country, with cities and villages, depend for their protection upon the natural river bank, which is private property. Perhaps, under such circumstances, it might not be too much to say, not only that the owner cannot do any positive act towards removing the embankment, but that he may properly be held responsible for the permissive waste of it, by negligence and inattention. And the

other cases hereinbefore stated, though very different in their facts, are similar in principle, all being cases in which the specific use prohibited, is so prohibited because it would be noxious, and cause or threaten damage to the lives, health, comfort, or property of other members of the community, equally entitled to protection. We think, therefore, that that case was rightly decided.

Supposing the principle itself to be well established, the great question then is, whether the act in question, fixing certain harbor lines, was within it; and we are of opinion that it is, although it may in some cases seem to trench somewhat largely on the profitable use of individual property. This opinion is founded on several considerations.

We have already alluded to the point, that a particular use of land, as well inland as on the sea-shore, which, in one situation, would be greatly injurious to common and public rights, in another position would be wholly harmless. A man having a hill of gravel on his farm, not constituting the embankment of a stream, may remove the earth at his pleasure, because such use can injure no one; when under other circumstances, it would be greatly injurious. Whether any restraint upon the use of land is necessary to the preservation of common rights and the public security, must depend upon circumstances, to be judged of by those to whom all legislative power is intrusted by the sovereign authority of the state, so to declare and regulate as to secure and preserve all public rights.

We think it is a consideration entitled to some weight, that the colony ordinance itself, which changed the tenure and extended the title of riparian proprietors to low water mark, so as to include the shore, was not absolute and unqualified. It contained a reservation, to the effect that riparian proprietors should not, by this extension of their territorial limits, have power to stop or hinder the passage of boats and vessels, in or through any sea, creeks, or coves, to other men's houses or lands. From these very general words, it is certainly difficult to prescribe exact limits to this reservation. That it was designed to impose some restriction in favor of the right of navigation is quite clear. To say, as it has sometimes been

contended, that the reservation was intended to prohibit any restraint upon the preëxisting right of navigation, and that all persons should have the same right of passing over it, with boats and vessels, as they had before, would seem to restrain any building thereon, and to render the act nugatory and of no practical effect. Besides; if the purpose was, as it has often been declared to be, to enable proprietors bounding on the shore to erect and build quays, wharves and warehouses thereon, for purposes incident to the great interests of commerce and navigation, such a construction of the act would defeat the purposes for which it was designed.

Again ; the construction which has been put upon this act, in all the judicial decisions which have been made upon it, many of which are cited in the former part of this opinion, has been, that, notwithstanding the act vests a fee in the soil in the riparian proprietor, analogous to the *jus privatum*, or right of property, which at the common law the crown could grant to a subject, yet that the land between high water and low water, until it was inclosed, built upon, or so occupied by the riparian proprietor, so far partook of its original character, that whilst covered by the tide water the public and all persons might lawfully use it, might sail over it, anchor upon it, fish upon it, and by so doing no person should be held to commit a trespass, or disseise the owner, or take adverse possession. The public used only a common right, by so using these lands when covered with tide water.

In putting a construction upon any statute, every part shall be regarded, and it shall be so expounded, if practicable, as to give some effect to every part of it. Looking at the terms of this law, and the purposes for which it was intended, the object seems to have been, to secure to riparian proprietors in general, without special grant, a property in the land, with full power to erect such wharves, embankments and warehouses thereon, as would be usually required for purposes of commerce, subordinate only to a reasonable use of the same, by other individual riparian proprietors and the public, for the purposes of navigation, through any sea, creeks or coves, with their boats and vessels

8*

In this connection, it may be proper to refer to the common law of England, as it existed at the time of the passing of the colony ordinance upon this subject; for though, on account of the difference of political organization, it cannot apply strictly to Massachusetts, either before or since the revolution, yet the principles of the common law may throw light on the subject, and aid us in coming to a true construction of that ordinance.

By the general rule of the common law, all real property capable of use and possession, and having no other acknowledged owner, is, in theory, vested in the king, as the head and sovereign representative of the nation.  The sea-shore, and all coves, bays and arms of the sea, as well as all navigable rivers, extending on the sea-shore as far towards the land as the tide flows, are deemed vested in and held by the king. In this holding by the crown, two distinct rights are regarded; viz. 1.  The *jus privatum*, or right of property in the soil, which the king may grant, and which may be held by a subject, and the grant of which will confer on the grantee such privileges and benefits, as can be enjoyed therein, subject to the *jus publicum*.  2.  The *jus publicum*, the royal prerogative, by which the king holds such shores and navigable rivers, for the common use and benefit of all the subjects, and indeed of all persons of all nations at peace with England, who may have occasion to use them for the purposes of trade.  This royal right, or *jus publicum*, is held by the crown in trust for such common use and benefit, and cannot be transferred to a subject, or alienated, limited or restrained, by mere royal grant, without an act of parliament.  The king's grant, therefore, although it may vest the right of soil in a subject, will not justify the grantee in erecting such permanent structures thereon, as to disturb the common rights of navigation; and such obstruction, notwithstanding such grant, is held to be a public or private nuisance, as the case may be.

Two or three passages from Lord Hale, the acknowledged authority upon this subject, will render this matter clear.

Hale *de Jure Maris*, chap. 4.  " It is admitted that *de jure communi*, between the high water and low water mark doth

*primâ facie* belong to the king, 5 Rep. 107; *Constable's Case*, Dyer, 326." "And as the shore of the sea doth *primâ facie* belong to the king, viz., between the ordinary high water and low water mark, so the shore of an arm of the sea, between the high and low water mark, belongs *primâ facie* to the king, though it may also belong to a subject, as shall be shown in the next chapter." 1 Hargr. Law Tracts, 12, 13.

Hale *de Jure Maris*, chap. 6. "But though the subject may thus have the propriety of a navigable river, part of a port, yet these cautions are to be added," &c. "2. That the people have a public interest, a *jus publicum*, of passage and repassage with their goods by water, and must not be obstructed by nuisances," &c. "For the *jus privatum* of the owner or proprietor, is charged with, and subject to that *jus publicum* which belongs to the king's subjects; as the soil of an highway is, which though in point of property it may be a private man's freehold, yet it is charged with a public interest of the people, which may not be prejudiced or damnified." 1 Hargr. Law Tracts, 36.

So in Lord Hale's part second, *De Portibus Maris*, chap. 7. "But when a port is fixed," "though the soil and franchise or dominion thereof *primâ facie* be in the king, or by derivation from him in a subject; yet that *jus privatum* is clothed and superinduced with a *jus publicum*, wherein both native and foreigners in peace with this kingdom are interested, by reason of common commerce, trade, and intercourse." "They ought to be preserved from impediments and nuisances, that may hinder or annoy the access or abode or recess of ships and vessels, and seamen, or the unlading or relading of goods." 1 Hargr. Law Tracts, 84.

It therefore appears, upon the authority of Lord Hale, that in regard to the sea-shore, arms of the sea, and navigable rivers, the king stood in two capacities, holding a *jus privatum*, or right of property in the soil, and also a *jus publicum*, or right, as sovereign, to hold such property under his royal authority, and power to regulate and govern, for the common use and benefit of all persons, for the purposes of navigation. The authority of Lord Hale, and the truth and soundness of

these positions, have been recognized and affirmed, in cases comparatively recent, by the highest tribunals of England, the court of exchequer, and the house of lords. *Attorney General* v. *Burridge*, 10 Price, 350; *Attorney General* v. *Parmeter*, 10 Price, 378; *Parmeter* v. *Attorney General*, 10 Price, 412, the latter being decided on appeal to the house of lords.

These cases distinctly affirmed the proposition, that whether an erection within tide water is a nuisance or not, does not depend on the question whether the party erecting it owns the soil or not, by a grant directly or immediately from the crown, but whether it is injurious to a port or harbor, or injurious to navigation, and to the common right and liberty of all subjects, and other persons, using the navigation.

We have already said that these rules could not be applied strictly in this state, either under the colonial or provincial government, or under the present constitution of the commonwealth, because there is no executive, holding two capacities, like the king of England, as head and sovereign of the kingdom. But as the colonial charter, in the first instance, and the province charter, reviving and confirming all the rights and powers granted by the former, if they had been in any degree impaired by its abrogation, were not made for regulating any rights within the territory of England, but were designed and intended to provide for a distinct colonial and dependent government, acknowledging continued allegiance to the king; they embraced as well the *jus publicum*, as the *jus privatum* of the crown, and embraced not only a grant of the soil of all seas, arms of the sea, and navigable rivers, but also conferred on the grantees so much of the *jus regium*, or royal prerogative, as might be necessary to control and regulate the admitted common-law right of all subjects and others, to the use of all benefits, both of fishing and navigation, connected with and dependent upon the sea and sea-shores, and all tide waters.

These principles are fully recognized and established in regard to other colonial governments, originating in charters granted by the crown of England in the early settlement of this country. Under the grant of Charles II. to his brother

the Duke of York, the powers of government, as well as the right of soil, were held to be granted ; but afterwards, in the time of queen Anne, a surrender was made by the proprietors, of the powers of government, and it was held that thereby the royalty, the *jus publicum,* or right of government, revested in the king, though the *jus privatum,* or right of property, remained with the proprietors. This clearly recognizes the distinction between the *jus publicum* and *jus privatum,* as established by the common law, and so established long before the settlement of this country. It was also held, that as a part of the royalties, or *jura prerogativa,* which revested in the crown, and afterwards, by the establishment of the independence of the United States, vested in the states respectively, was the right to control and regulate the use of the sea and salt water, for all the purposes of navigation and fishing, to be held and used as a common benefit for the public. *Martin* v. *Waddell,* 16 Pet. 367; *Pollard* v. *Hagan,* 3 How. 212; *Gough* v. *Bell,* 1 Zab. 156, and 2 Zab. 441.

We think it clear therefore, that the colony charter, revived and confirmed as it was by the province charter, was not a mere grant of the soil of the territory of Massachusetts, but carried with it so much of the royal prerogative, as was necessary for holding, appropriating, and governing the sea and its shores, arms and branches, and also so much, as was necessary for securing the acknowledged common and general right of the subjects to its free navigation and fisheries. These powers vested in the colonial and provincial governments, and were vested in the commonwealth after the revolution, together with all other royalties, rights of the crown, and power of regulation, which had at any time previously been held and exercised by the government of England. But for reasons already given, the distinction between the *jus publicum* and the *jus privatum* could not be applied to the colony ordinance, as if it were a grant of the crown, without the sanction of parliament, because both powers vested in the colonial government, and may be taken into view in giving effect to the colonial ordinance.

But the use which we think may be justly made of these

principles, and of these views of the law of England, as it had existed long anterior to the emigration of our ancestors to America, is this: They had been accustomed to regard the use of the sea-shores, for navigation and fishing, as *publici juris*, to be held and regulated for the common and general benefit; and this, although in many cases the right of soil was vested by private grant in an individual. They had long been familiar with the practice of the crown to make grants of the *jus privatum*, or right of property in the soil, in the sea-shore over which the tide ebbed and flowed, which would warrant the grantee of the crown in erecting thereon wharves, quays, and warehouses, for facilitating navigation and commerce, provided such erections did not hinder or obstruct navigation, or become a nuisance. If such a wharf or other erection were such as to interfere essentially with the common right of navigation, it would be held by the common law to be a common nuisance, and could not be justified, even by the king's grant, unless sanctioned by an act of parliament. These rules and practices were familiar to the minds of our English ancestors at their emigration, and we may presume that the colonial government had them in view when, by a general act, it annexed the sea-shore to the upland, and made it the private property of the riparian proprietor. It must have well understood that all estate granted by the government to individuals is subject, by reasonable implication, to such restraints in its use, as shall make the enjoyment of it by the grantee consistent with the equal enjoyment by others, of their several and common rights. When therefore the government did, by such general act, grant a right of separate property in the soil of the sea-shore, to enable the riparian proprietor to erect quays and wharves for a better access to the sea, and by the same act reserved some right to individuals and the public of passing and repassing with vessels, but without defining it, it seems just and reasonable to construe such reservation much more liberally in favor of the right reserved, than it otherwise would be under other circumstances.

And so in the exercise of the more general power of government, so to restrain the injurious use of property, it seems to

apply more significantly and more directly to real estate thus situated on the sea-shore, separating the upland from the sea, to which the public have a common and acknowledged right, so that such estate should be held subject to somewhat more restrictive regulations in its use, than interior and upland estate remote from places in which the public have a common right. The circumstances are different. In respect to land lying in the interior, and used for agricultural purposes, there is little occasion to impose any restraint upon the absolute dominion of the owner, because such restraint is not necessary to prevent it from being injurious. But the circumstances are entirely different in regard to the sea-shore, which lies between the sea, admitted to be common to all, and the use of which is of vast importance to the public, and ports and places, without access to which, the use of the sea for navigation would be of little value.

Considering, therefore, that all real estate derived from the government is subject to some restraint for the general good, whether such restraint be regarded as a police regulation or of any other character; considering that sea-shore estate, though held in fee by the riparian proprietor, both on account of the qualified reservation under which the grant was made, and the peculiar nature and character, position and relations of the estate, and the great public interests associated with it, is more especially subject to some reasonable restraints, in order that the exercise of full dominion over it, by the proprietor, may not be noxious to others, and injurious to the public, the court are of opinion that the legislature has power, by a general law affecting all riparian proprietors on the same line of shore equally and alike, to make reasonable regulations, declaring the public right, and providing for its preservation by reasonable restraints, and to enforce these restraints by suitable penalties.

Wherever there is a general right on the part of the public, and a general duty on the part of a land owner, or any other person, to respect such right, we think it is competent for the legislature, by a specific enactment, to prescribe a precise, practical rule for declaring, establishing, and securing such

right, and enforcing respect for it. It may be said in general terms, independently of any positive enactment, that it is the right of society, in the midst of a populous settlement, to be exempt from the proximity of dangerous and noxious trades , and that it is the duty of the owner of real estate, in the midst of many habitations, to abstain from erecting buildings thereon, or otherwise using it, for carrying on a trade danger-ous to the lives, health, or comfort of the inhabitants of such dwellings; although a trade in itself useful and beneficial to the public. But such general duty and obligation not being fixed by a rule precise enough for practical purposes, we think it is competent for the legislature to interpose, and by a spe-cific enactment to declare what shall be deemed a dangerous or noxious trade, under what circumstances and within what distance of habitations it may or shall not be set up, how the use of it shall be regulated, and to prohibit any other than such regulated use, by specific penalties.

This principle of legislation is of great importance and ex-tensive use, and lies at the foundation of most enactments of positive law, which define and punish *mala prohibita.* Things done may or may not be wrong in themselves, or necessarily injurious and punishable as such at common law; but laws are passed declaring them offences, and making them punisha-ble, because they tend to injurious consequences; but more especially for the sake of having a definite, known and au-thoritative rule which all can understand and obey. In the case already put, of erecting a powder magazine or slaughter-house, it would be indictable at common law, and punishable as a nuisance, if in fact erected so near an inhabited village as to be actually dangerous or noxious to life or health. Without a positive law, every body might agree that two hundred feet would be too near, and that two thousand feet would not be too near; but within this wide margin, who shall say, who can know, what distance shall be too near or otherwise ? An authoritative rule, carrying with it the cha-racter of certainty and precision, is needed. The tradesman needs to know, before incurring expense, how near he may build his works without violating the law or committing a

nuisance; builders of houses need to know, to what distance they must keep from the obnoxious works already erected, in order to be sure of the protection of the law for their habitations. This requisite certainty and precision can only be obtained by a positive enactment, fixing the distance, within which the use shall be prohibited as noxious, and beyond which it will be allowed, and enforcing the rule thus fixed, by penalties.

Many cases will suggest themselves, where the legislature interposes by statute to declare, protect and regulate public rights, although those rights are public easements only, over lands of which the fee of the soil is in private proprietors. Such are laws regulating the construction and repairs of roads, highways and bridges; declaring how they shall be graded, what barriers shall be erected to guard travellers against dangerous places, and what obstructions shall be removed.

Without attempting to enumerate the various cases of legislation which fall within this principle, we would refer, by way of illustration, to one class of public rights, very analogous to those of navigation and of fishing in the sea and on the sea-shores, which have been recognized and acknowledged as public, and as such regulated by legislative enactments, and protected by specific statute penalties; that is, the rights of the public in rivers not navigable. Technically, those rivers are not navigable where the sea doth not ebb and flow, although they may be very serviceable for navigation with boats and rafts, and even for larger vessels moved by sails or steam. Such are the Connecticut, the Merrimac, and many others, above the ebb and flow of the tide. In these rivers, it is the established rule of law in this commonwealth, that the riparian owner has a fee in the soil from his own side to the middle of the river, or *ad filum medium aquæ. King* v. *King*, 7 Mass. 496; *Lunt* v. *Holland*, 14 Mass. 149; *Hatch* v. *Dwight*, 17 Mass. 289; *Ingraham* v. *Wilkinson*, 4 Pick. 268. In rivers not navigable, the riparian owner is deemed, in virtue of his title to the soil, to have a several fishery in that part of the river which lies against his upland, to the centre of the river. *Freary*

v. *Cooke*, 14 Mass. 488; *Waters* v. *Lilley*, 4 Pick. 145; *Com-monwealth* v. *Chapin*, 5 Pick. 199.

· These may be considered as private rights in the shores of rivers not navigable, and therefore not pertinent to the present subject; but in addition to these are two acknowledged public rights, which are regarded as such, to be preserved and main-tained for general and common use, although every portion of the soil over which the rivers flow, is the private property of the riparian owners.  These are:  1. The right of pas-sage with boats, rafts, and other vessels adapted to the use of such waters:  2. The right of the public to have these rivers kept open and free for the migratory fish, such as sal-mon, shad and alewives, to pass from the sea, through such rivers, to the ponds and head waters, to cast their spawn. Both of these rights are recognized as public rights in the case of *Commonwealth* v. *Chapin*, 5 Pick. 199.  The defendant was indicted for erecting a dam across Connecticut River, near the head of South Hadley Falls, alleged to be a nuisance at common law in three respects: 1. As an obstruction to the navigation of the river:  2. As injurious to the health of the neighboring inhabitants:  and 3. As an obstruction to the passage of fish through the river to its head waters.  The jury, by their verdict, found that it did not obstruct the navi-gation, and did not injure the public health; but that it did hinder the passage of fish.  The court decided that, though this river, at that place, was not navigable in the technical sense, yet that the right to navigate it with rafts, boats and other suitable vessels, was a public right, although the entire soil under it was owned by the riparian proprietors; that although such riparian owners had a several fishery on their own shores, it was the right of taking fish on those shores, but was subordinate to the public right, to have the fish, in their proper season, pass up to the head waters to cast their spawn, and that the riparian proprietors, although they owned the entire bed of the river, could not so use it as to obstruct the passage of fish; and lastly, that such public right might be declared, regulated and enforced by the legislature by sta-tute.

We are not aware that the right of navigation, for boats, &c., in inland rivers, above tide waters, though technically not navigable, has ever been denied or seriously drawn in question. The case of *Spring* v. *Chase*, in 1799, before we had any regularly published reports, found in 2 Dane Ab. 696, may seem to throw doubt upon it. The action was for pulling down a bridge on Saco River, above the falls, and of course above the flow of the tide, which had been built by the plaintiff, who owned the land on both sides, and of course owned the soil in the bed of the river. The defendant justified, on the ground that the bridge was a public nuisance; but the court gave judgment for the plaintiff. The reasons are not stated; but this judgment may well have been warranted, on the ground that the plaintiff had a right to build a bridge on his own soil, if it did not impede the public right of navigation for rafts and boats; that all rafts, and such boats as could pass on that river, could well pass under the bridge, and so the bridge was not a public nuisance.

Many judicial decisions have declared this right of passage with boats and vessels on rivers not navigable, to be a public right, and many acts of legislation have been passed, authorizing dams across rivers, and wing-dams, connected with locks and side canals, to secure and facilitate their public right of inland navigation.

But the other public right in these rivers, and the manner in which it has been enforced by statute law, is much more to the present purpose. The right of having the migrating fish pass in their seasons through these rivers, over the soil of riparian proprietors, has been declared and enforced by statute, as a public right; and the private rights of riparian proprietors are held subject to such regulation. *Stoughton* v. *Baker*, 4 Mass. 522; *Burnham* v. *Webster*, 5 Mass. 266; *Commonwealth* v. *Ruggles*, 10 Mass. 391.

The most important of these cases, and most directly bearing on the present question, is that of *Stoughton* v. *Baker*. It respected a mill erected in 1633 by Israel Stoughton, under a grant from the town of Dorchester, and confirmed by the colonial government, at Milton Lower Mills, and was probably the

first mill erected in the colony.   No reservation for the pass-
age of fish up the Neponset was made in the grant, and no
fishways were made until 1805, when the legislature appointed
a committee, with authority to require such fishways to be
opened, as would allow the fish to pass up.   The court decided
that the right to have the fish pass up was a public right; that
every owner of a mill dam holds it under a limitation that a
sufficient and reasonable passage shall be allowed for the fish;
and that this limitation is not extinguished by any neglect of
the government in compelling the owner to comply.   The court,
in their judgment, by Parsons, C. J., say, that " Stoughton took
a fee in the mill privilege, with a right to build a dam; but
this right was under several implied limitations; one was to
protect the rights of the public in the fishery, so that the dam
must be so constructed that the fish should not be interrupted
in their passage up the river to cast their spawn.   This limit-
ation, being for the benefit of the public, is not extinguished
by any inattention or neglect in compelling the owner to com-
ply with it."
    One early act is so direct an exercise of legislative power
to declare and enforce a public right, and so exemplary an in-
stance of the caution and forbearance, and the just regard for
private rights, with which it ought to be used, that we desire
to refer to it.   It is the provincial act of 15 George II., passed
in 1741.   After reciting the great damage occasioned by the
erection of dams, notwithstanding the several acts made for
the preservation of the fish, it provides that all dams after-
wards to be built across streams in which salmon, shad and
alewives usually pass up, shall be made with sufficient fish-
ways, and in all dams made before the passage of the act,
such sufficient fishways shall be made and opened, at the ex-
pense of the owner; with a proviso, that any owner of a dam
built before 1709, who was required by the act to open such
fishway, should be reimbursed the first cost thereof; but that
all such dams should be afterwards maintained at the expense
of the owners.   In this act it is manifest that the right to the
fishery was a public right; that mill owners and all other
riparian proprietors took their title in the soil, subject to the

public right; that this public right may be declared and en-
forced by statute; that those who have erected dams, before
oeing warned and expressly prohibited by statute, although
they infringed a public right, and might perhaps have been
indicted at common law, were yet so far excusable, that,
when specially required to make provision for the restoration
and enjoyment of the public right, they should be repaid the
first expense of the alteration, though, because it was a public
right to which their private estate was subject, they should
ever after maintain such passage way for fish at their own
expense. Mass. Perpet. Laws, 297.

Now the only ground of principle on which these laws
could have been made and sanctioned, and adjudged valid by
the highest tribunals of the Commonwealth, is, that although
the right of soil in rivers not navigable is in private proprie-
tors, yet this is held subject to a public right; that although
the violation of such public right by a riparian proprietor, or
any one else, was a public offence, and as such might be
punished at common law; yet, because it was a public right,
the legislature might declare it, and regulate it by suitable
enactments and penalties, by precise and positive rules, as to
times and other particulars, better adapted to secure the right
to the public, and guard all persons concerned against its
infringement, than the general principle of the common law
could be.

In the case of *Stoughton* v. *Baker*, the court say that the
public, having a right to the benefits of this limitation, (for
the passage of fish) there must be some remedy, by which
this public benefit may be secured; and shortly after add:
" the legislature may make all laws not repugnant to the
constitution, and we do not know that this law is repugnant
to it."

This power of the legislature to declare and regulate the
public right, is asserted, perhaps even more strongly, in the
more recent case of *Commonweath* v. *Chapin*, 5 Pick. 199, in
which it was decided that the provincial act of 15 George II.
was still in force, and because it provided a different remedy
for an injury to the public rights by building a dam, the com-

mon law was superseded by the statute, and therefore that an indictment at common law could not be maintained, but the prosecution must be on the statute.

But in reference to the present case, and to the act of the legislature, establishing lines in the harbor, beyond which private proprietors are prohibited from building wharves, it is urged that such a restraint upon the estate of an individual, debarring him to some extent from the most beneficial use of it, is in effect taking his estate. If such restraint were in fact imposed upon the estate of one proprietor only, out of several estates on the same line of shore, the objection would be much more formidable. But we are to consider the subject matter, to which such restraint applies. The value of this species of estate, that of shore and flats, consists mainly in the means it affords of building wharves from the upland towards deep water, to place merchandise and build wharves upon, and principally to afford access, to vessels requiring considerable depth of water, from the sea to suitable landings. Now, if along a shore where there are flats of considerable extent, one were restrained to a certain length, whilst others were allowed to extend further, the damage might be great. So if one were allowed to extend, and the coterminous proprietors adjacent were restrained, it would be obviously more injurious. The one extended would stop or check the current along the others, cause mud to accumulate near them, and thus render the water shoal at those wharves. But where all are permitted to extend alike, and all are restrained alike, by a line judiciously adapted to the course of the current, so that all have the benefit of access to their wharves, with the same depth of water, and the same strength of current at their heads, the damage must be comparatively less.

But of this the legislature must judge. Having once come to the conclusion that a case exists, in which it is competent for the legislature to make a law on the subject, it is for them, under a high sense of duty to the public and to individuals, with a sacred regard to the rights of property and all other private rights, to make such reasonable regulations as they may judge necessary to protect public and private rights, and

to impose no larger restraints upon the use and enjoyment of private property, than are in their judgment strictly necessary to preserve and protect the rights of others.

In regard to the case of Mr. Alger, the report states that a certain piece of wharf, called a triangular piece, was erected and placed in its position beyond the line, after the law fixing the line had been passed; but that some other portions, though actually beyond the line, were erected, and the obstructions complained of actually placed in their position, before the law was passed; and also that the wharf complained of does not obstruct the navigation of boats and vessels.

In regard to the first suggestion, it may be necessary to examine the facts more minutely before any final judgment is entered. If any portion of this erection, described in the indictment, had been actually made and placed in its position before the act was passed, the court are all of opinion that the owner is not liable to its penalties. These laws were future and prospective in their terms and in their operation. They proceed on the assumption, that before they were passed, every man had a right to build on his own flats, if the erection did not in fact operate to impede navigation, and render him indictable as at common law; and that the common law, in thus lending its aid in the prosecution of actual injuries to navigation, to be proved in each case as nuisances, would be sufficient to secure the public against encroachments, without legislation. But, for the reasons hereinbefore given, it seems to us highly important to have a more precise and definite law made and promulgated, by which all persons may more certainly know their own and the public rights, and govern themselves accordingly.

If, indeed, before the passing of these laws, any one had so built into navigable water as to cause a public nuisance, he may be liable to indictment and punishment, but not by these laws, fixing harbor lines. It follows, therefore, that all persons who built on their own soil before these laws, in a manner not amounting to a public nuisance, independently of them, had exercised only their just and lawful right; and any laws, made to punish acts lawful at the time they were done, would

Commonwealth *v.* Alger.

be *ex post facto,* contrary to the constitution and to the plainest principles of justice, and of course inoperative and void.

In regard to the other suggestion, that it is found by the case that the particular wharf of Mr. Alger did not obstruct or impede navigation, it is proper to say, that if we are right in principle, we are bound to hold that this circumstance can afford no defence. A consideration of this fact illustrates the principles we have been discussing. The reason why it is necessary to have a certain and authoritative law, is shown by the difficulty, not to say impracticability, of inquiring and deciding as a fact, in each particular case, whether a certain erection in tide water is a nuisance at common law or not; and when ascertained and adjudged, it affords no rule for any other case, and can have little effect in maintaining and protecting the acknowledged public right. It is this consideration, (the expediency and necessity of defining and securing the rights of the public,) which creates the exigency, and furnishes the legislature with the authority to make a general and precise law; but when made, because it was just and expedient, and because it is law, it becomes the duty of every person to obey it and comply with it. The question under the statute therefore is, not whether any wharf, built after the statute was made and promulgated, was an actual obstruction to navigation, but whether it was within the prohibited limit.

On the whole, the court are of opinion that the act fixing a line within the harbor of Boston, beyond which no riparian proprietor should erect a wharf or other permanent structure, although to some extent it prohibited him from building such structure on flats of which he owned the fee, was a constitutional law, and one which it was competent for the legislature to make; that it was binding on the defendant, and rendered him obnoxious to its penalties, if he violated its provisions.